**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN CRAIG ELFAND,<br><br>  Plaintiff,<br><br>  v.<br><br>COUNTY OF SONOMA; WILLIAM COGBILL; STEVE FREITAS; OFFICER TANNEHILL,<br><br>  Defendants.<br> _____ / | No. C 10-5692 WHA (PR)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Docket No. 39) |

**INTRODUCTION**

This is a civil rights action filed under 42 U.S.C. 1983 by a state prisoner proceeding pro se. The original complaint was dismissed, and plaintiff filed an amended complaint naming new defendants and additional claims.[1] (Docket No. 24.) Defendants have filed a motion for summary judgment, in which they also assert that they are entitled to qualified immunity. (Docket No. 39.) Plaintiff has filed an opposition, and defendants have filed a reply. For the reasons set out below, the motion for summary judgment is **GRANTED**.

---

[1] On June 16, 2011, defendant Sonoma County Main Adult Detention Facility's ("MADF") motion to dismiss the complaint for failure to state a cognizable claim for relief was granted, and plaintiff was granted leave to file an amended complaint to cure several deficiencies in the amended complaint. Plaintiff filed an amended complaint dropping MADF as a defendant, and naming as defendants the County of Sonoma, the Sheriff-Coroner Steve Freitas, the former Sheriff-Coroner William Cogbill, and the jail's former Programs Officer Tannehill. Defendants' motion to screen the amended complaint, in which they also request its dismissal, was granted in part and denied in part. (*See* Docket No. 26.)

**STATEMENT**

The following facts are undisputed unless otherwise indicated.

On September 28, 2009, plaintiff was arrested for several marijuana-related charges, and brought to Sonoma County's Main Adult Detention Facility ("MADF") for booking. While he was being processed to enter the facility, plaintiff informed the intake staff that he was a practicing Jew and requested kosher meals, religious head-wear and a prayer book (Amd. Compl. at 2). Intake staff advised plaintiff to check with the staff at the resident module to which he was sent (*ibid*.).

Prior to being housed in the MADF, each arrestee was provided with the Sonoma County Sheriff's Officer's Inmate Handbook which described various policies and procedures for inmate housing. Plaintiff was provided with such a handbook, which stated:

> If you require a "religious diet," send an *Inmate Request Form* to the Inmate Services Coordinator at the MADF. . . . Specify in the form the type of diet required, your religion, and your place of worship. These officers will verify your requirement before you receive a religious diet. A religious diet will be allowed only if your religion mandates one.

(Lawrence Decl., Exh. E at 14; Dkt. No. 45.)

As soon as he arrived in module "J," plaintiff inquired of staff how to acquire the religious items he needed. He was advised to check with the morning staff. The next morning on September 29, 2009, between 8:30 am and 9:00 am, plaintiff again asked the staff on duty how to acquire the religious items he needed, and was told by a staff member that he would "make some calls to figure it out," but left before the dinner meal without further word to plaintiff. Evening staff again told plaintiff to inquire of the day shift (Amd. Compl. 2).

Plaintiff was informed the next day, September 30, 2009, that the programs officer would speak to him shortly (*ibid.*). Plaintiff waited the whole of the next day, October 1, 2009, without hearing from the programs officer. Plaintiff inquired of the evening staff the status of his request, claiming that he had been unable to eat for three days (*id*. at 3). He was told to fill out an Inmate Request Form to the programs officer requesting everything he needed (*ibid.*). Plaintiff filled out a form that evening, telling the programs officer that "he had been trying to acquire kosher meals, religious head-wear and a Jewish prayer book since arriving [at the

2

facility] on September 28th and needed assistance to accomodate [*sic*] his needs" (*ibid.*). Plaintiff submitted the form to staff on October 2, 2009 (*ibid.*). Plaintiff submitted a copy of this form with his opposition (Opp. Attach.). The receiving staff signature is illegible and is dated October 6, 2009. According to defendants, they have no record of receiving this request.

Although plaintiff did not receive kosher meals during the early days of his admittance to MADF, he continued to eat the non-kosher meals. If an inmate declined food or returned his food uneaten, MADF staff were required to write this information down in the inmate's Management Notes (Br. 5). If an inmate did not eat for an entire day, MADF staff were required and trained to talk with the inmate about his refusal to eat and address the matter accordingly (*ibid.*). None of the MADF staff made any notes of plaintiff's refusal to eat at any time during his incarceration (*ibid.*).

Plaintiff never got a response to his first inmate request, and when he continued to ask staff for assistance, staff summoned superior officers who informed Plaintiff that nothing could be done until he had spoken with the programs officer (*ibid.*). Plaintiff filled out a second request form on October 18, 2009, making the same requests as before, but with no response. Plaintiff submitted another request on October 22, 2009, which also went unanswered (*ibid.*). According to defendants, the first record of plaintiff actually making a request for kosher food was dated October 18, 2009 – twenty days after he was first brought into custody (Br. 1). MADF policies and practices required inmates to hand Inmate Request Forms directly to MADF staff, who are required to return a pink carbon copy of the form as a receipt to the inmate (*id*. at 4). Plaintiff was unable to provide receipts for a single request prior to October 22, 2009, claiming that he had sent the receipts to his attorney to be copied (*ibid.*).

The MADF Program Deputy, who was defendant Tannehill at the time of plaintiff's allegations, was responsible for reviewing and addressing inmate requests for religious accommodations (*id*. at 2). Defendant Tannehill did not learn of plaintiff's request for religious accommodations until late in October 2009. Defendant Tannehill was out of the area at a Department-sponsored training beginning October 21, 2009, and first became aware of plaintiff's requests when he returned to MADF on October 27, 2009 (*ibid.*). Tannehill had

3

1  made arrangements to have another MADF division review all inmate request forms routed to
2  the MADF Programs Unit while he was away, and for that division to address those requests
3  that were deemed urgent or otherwise should not wait until Tannehill's return. Plaintiff's
4  request was not identified as urgent, and thus was not addressed until Tannehill's return (*ibid*.).

5  Plaintiff submitted an Inmate Grievance Form on October 25, 2009, which he dated
6  October 22, 2009, complaining of the unanswered requests to the programs officer which
7  caused him to "violate his religion for approximately a month" (*ibid*.). The first entry in
8  plaintiff's Management Notes regarding his request for kosher meals was entered on October
9  25, 2009, which noted that plaintiff had submitted a grievance for religious meals (Br. 5). The
10 note also stated, "[h]owever [plaintiff] seems to have a good appetite and ate tonight's dinner
11 meal service and eats food from the commissary during his OCA [out of cell activity] intervals"
12 (Lawrence Decl., Exh. K at 1).

13 Upon his return to MADF on October 27, 2009, Tannehill reviewed plaintiff's request
14 submitted on October 18, 2009, and the grievance submitted on October 25, 2009, and
15 personally met with plaintiff to discuss the issues (*ibid*.; Br. 5). These were the first requests
16 for religious accommodations Tannehill received from plaintiff, and he had never before
17 received information that plaintiff was seeking such accommodations. (Tannehill Decl. ¶ 7.)
18 Tannehill determined that plaintiff's request for kosher meals fell within MADF policy
19 mandates, and waived the written requirement from the inmate's religious advisor/organization
20 that was required to obtain a religious diet (Br. 2). He informed plaintiff that he would approve
21 plaintiff's request for kosher meals based solely on his written request and their discussion
22 (*ibid.*). Plaintiff made no additional requests for religious accommodations during this meeting
23 (*ibid.*).

24 Later the same day, Tannehill met with personnel from the MADF's food service
25 provider (Aramark) to make arrangements for them to provide plaintiff with kosher meals as
26 soon as possible (*id.* at 2-3). Aramark personnel informed Tannehill that they did not have any
27 kosher meals in stock and would have to order such meals, which would take up to a couple of
28 days (*id*. at 3). Aramark personnel went to San Francisco to obtain kosher meals and began

4

1  providing plaintiff's with kosher food as early as the next day, on October 28, 2009, and
2  continued to provide him with a kosher diet every day thereafter (*ibid.*).

3  Defendant Tannehill proceeded to address plaintiff's other requests for religious
4  accommodations and met with him several times in plaintiff's housing unit (Tannehill Decl. ¶
5  10). Over the next several weeks, Tannehill researched information in regard to the Jewish
6  faith and obtained religious literature that could be provided to inmates upon request (*ibid.*).
7  Plaintiff was able to obtain religious head-wear and a prayer book approximately ten days later
8  from his family (Amd. Compl. 4).

## ANALYSIS

11  Summary judgment is proper where the pleadings, discovery and affidavits show that
12  there is "no genuine issue as to any material fact and that the moving party is entitled to
13  judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect
14  the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute
15  as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a
16  verdict for the nonmoving party. *Ibid.*

17  The moving party for summary judgment bears the initial burden of identifying those
18  portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine
19  issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986); *Nissan Fire &
20  Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). When the moving party has
21  met this burden of production, the nonmoving party must go beyond the pleadings and, by its
22  own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial
23  *Ibid.* If the nonmoving party fails to produce enough evidence to show a genuine issue of
24  material fact, the moving party wins. *Ibid.*

25  Once the moving party meets its initial burden, the nonmoving party must go beyond the
26  pleadings to demonstrate the existence of a genuine dispute of material fact by "[c]iting to
27  specific parts of materials in the record" or "[s]howing that the materials cited do not establish
28  the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). A triable dispute of

5

material fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249. If the nonmoving party fails to make this showing, "[t]he moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

**B.    LEGAL CLAIMS AND ANALYSIS**

Plaintiff claims that defendant Tannehill violated his rights by his lack of response to plaintiff's several oral and written requests for religious accommodations. Plaintiff's second claim is that the MADF policy on religious meals is unconstitutional. Lastly, plaintiff claims that defendant Sonoma County and its administrators, former Sheriff-Coroner William Cogbill and current Sheriff Steve Freitas violated his rights by failing to maintain a policy or procedure to accommodate inmate's requests for religious accommodations in the event of a program officer's lack of availability or response to such requests. Liberally construed, plaintiff's allegations state a cognizable claim for the violation of his First Amendment right to the free exercise of religion, as well as for a violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA). *See* 42 U.S.C. 2000cc-1 *et seq.*.

**1.    FIRST AMENDMENT CLAIM**

The First Amendment guarantees the right to the free exercise of religion. *Cruz v. Beto*, 405 U.S. 319, 323 (1972). "The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987); *Turner v. Safley*, 482 U.S. 78 (1987). In order to establish a free exercise violation, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate

6

penological interests. *See Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008). Prisoners' right to the practice of his religion includes "the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987). Allegations that prison officials refuse to provide a healthy diet conforming to sincere religious beliefs states a cognizable claim under section 1983 of denial of the right to exercise religious practices and beliefs. *See Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (Jewish inmate claiming denial of kosher diet), *cert. denied*, 510 U.S. 1192 (1994); *McElyea*, 833 F.2d at 198 (same); *Moorish Science Temple, Inc. v. Smith*, 693 F.2d 987, 990 (2d Cir. 1982) (Muslim inmate claiming denial of proper religious diet).[2]

A prisoner is not required to objectively show that a central tenet of his faith is burdened by a prison regulation to raise a viable claim under the Free Exercise Clause. *Id.* at 884-85. Rather, the sincerity test of whether the prisoner's belief is "sincerely held" and "rooted in religious belief" determines whether the Free Exercise Clause applies. *Ibid.* (finding district court impermissibly focused on whether consuming Halal meat is required of Muslims as a central tenet of Islam, rather than on whether plaintiff sincerely believed eating kosher meat is consistent with his faith). The prisoner must show that the religious practice at issue satisfies two criteria: (1) the proffered belief must be sincerely held and (2) the claim must be rooted in religious belief, not in purely secular philosophical concerns. *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (cited with approval in *Shakur*, 514 F.3d at 884).

The burden then falls on the prison officials to prove that the burden on plaintiff's exercise of religion was reasonably related to a legitimate penological objective. *See Ashelman v. Wawrzaszek*, 111 F.3d 674, 677-78 (9th Cir. 1997) (applying test from *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), and *Turner*, 482 U.S. 78, to determine reasonableness of

---

[2] It is appropriate for prison authorities to deny a special religious diet if an inmate is not sincere in his religious beliefs. *See McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987); *cf. Africa v. Pennsylvania*, 662 F.2d 1025 (3d Cir. 1981) (prisoner who was founder of religion denied his diet of all raw foods, but even though his ideas most sincerely held, his religion did not constitute religion within 1st Amendment), *cert. denied*, 456 U.S. 908 (1982). It may also be appropriate under *Turner* to deny a religious diet if the prisoner refuses to fill out a standardized form asking for it. *Resnick v. Adams*, 317 F.3d 1056, 1063 (9th Cir. 2003).

7

decision denying Jewish inmate's request for an all-kosher diet); *see, e.g., Shakur*, 514 F.3d at 887-888 (remanding First Amendment claim regarding alternative kosher diet requested by prisoner for district court to make sufficient findings pursuant to *Turner* as to impact of the accommodation on the prison and the availability of ready alternatives). In making such a determination, the district court should consider four factors:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and the governmental objective itself must be a legitimate and neutral one. A second consideration is whether alternative means of exercising the right on which the regulation impinges remains open to prison inmates. A third consideration is the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources. Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

*Allen v. Toombs*, 827 F.2d 563, 567 (9th Cir. 1987) (citing *Turner*, 482 U.S. at 89-91).

Defendants argue that plaintiff fails to show that they violated his First Amendment right because he cannot satisfy *Malik's* "sincerity test." They assert that plaintiff's conduct and admissions demonstrate that his proffered belief in keeping kosher as part of his religion is not a sincerely held religious belief. They assert that plaintiff did not make any request for kosher meals until 20 days after he was admitted into custody at MADF, *i.e.*, until October 18, 2009, when he submitted his first inmate request. Defendants argue that plaintiff's adherence to the Jewish faith is "spotty and inconsistent" as he does not consistently maintain a kosher diet as evidenced by his food purchases from the MADF commissary. Plaintiff's commissary purchases demonstrate that he repeatedly bought many non-kosher foods, including Chili Ramen, cajun shrimp, nacho chips, trail mix, cheese dip, and other non-kosher foods. Furthermore, MADF staff observed plaintiff consuming the foods, without any indication that he gave the food away, which would be a breach of MADF inmate rules.

Furthermore, defendants argue that plaintiff's actions demonstrate that his claim is not rooted in religious purposes, but rather based on purely secular philosophical concerns. Defendants assert that plaintiff is attempting to utilize the Jewish faith to obtain special treatment, special foods, or better and more foods, and has manipulated the MADF staff to obtain them. For example, when a MADF staff member met with plaintiff to discuss his

8

grievance on November 17, 2009, plaintiff stated that he did not particularly like the kosher meals he was being provided at breakfast time, and requested that he be provided kosher meals similar to the food that he had received in Federal prison. (Gallaway Decl., Exh. A.)

In opposition, plaintiff does not deny that he ate the non-kosher meals provided by the prison. Rather, he asserts that a "religious person makes mistakes in life known as sins, or there would be no reason to have times and ways to ask G-D for forgiveness." (Opp. 3.) Plaintiff argues that with respect to the commissary items, the items were not marked as kosher such that plaintiff had to determine which were kosher and which were not (*ibid.*). He also asserts that "because the commissary list contained very few kosher items and each item had a quantity restriction, it is not unthinkable that the plaintiff would purchase non-kosher items to trade with other inmates for kosher items," and that his failure to follow the facility rules in this regard has "nothing to do with the sincere belief in his faith" (*id.* at 3-4).

Viewing the evidence in the light most favorable to plaintiff, as well as the inferences to be drawn from the facts, it cannot be said that plaintiff's need for kosher meals and other religious accommodations did not come from a sincerely held belief in the Jewish faith. *See T.W. Elec. Serv.*, 809 F.2d at 631. Defendants' argument that plaintiff's actions show a failure to strictly comply with Orthodox Jewish faith is not necessarily enough to overcome plaintiff's belief that kosher meals is consistent with his faith; the standard under *Malik* is "sincerely held," not "strictly held." Furthermore, there is a dispute as to whether plaintiff actually submitted an Inmate Request for kosher meals on October 2, 2009. With his opposition, plaintiff has submitted a copy of the alleged inmate request (Opp. Attach. 1), which defendants question the veracity and authenticity of (Sur-reply Br. 4). In light of this conflicting evidence, defendants have failed to show the absence of a genuine issue as to any material fact with respect to plaintiff's First Amendment claim.

///

### 2. QUALIFIED IMMUNITY

In the alternative, defendants assert that they are entitled to summary judgment based on qualified immunity.

9

The rule of qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law;'" defendants can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. *Ibid.* Regarding the first prong, the threshold question must be: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The inquiry of whether a constitutional right was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition. *Id.* at 202. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Ibid*.

Even if the violated right is clearly established, qualified immunity shields an officer from suit when he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances he confronted. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Saucier*, 533 U.S. at 205-06. If "the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." *Id.* at 205. A defendant must show that a reasonable officer could have believed that the conduct was lawful in light of clearly established law and the information the officer possessed. *Galvin v. Hay*, 374 F.3d 739, 756-57 (9th Cir. 2004). In addition, the court may grant qualified immunity by viewing all of the facts most favorably to plaintiff and then finding that under those facts the

10

defendants could reasonably believe they were not violating the law. *See, e.g., Marquez v. Gutierrez*, 322 F.3d 689, 692-93 (9th Cir. 2003); *Estate of Ford v. Caden*, 301 F.3d 1043, 1051-53 (9th Cir. 2002).

On the facts presented herein and viewed in the light most favorable to plaintiff, defendant Tannehill prevails as a matter of law on his qualified immunity defense because the record establishes that even if plaintiff's First Amendment right was violated, defendant could reasonably believe his conduct was lawful. Plaintiff claims that he submitted an Inmate Request form as early October 2, 2009, but provides no evidence showing that defendant Tannehill had actual knowledge of this inmate request. The receiving staff signature on the copy provided by plaintiff does not appear to be that of defendant, nor does plaintiff allege that it is. As discussed above, from his entry into MADF, plaintiff was regularly eating his non-kosher meals notwithstanding his requests for kosher meals. Plaintiff was also supplementing his diet with non-kosher foods purchased from the commissary. Accordingly, a reasonable officer could have believed that he was not unduly burdening plaintiff's right to practice his religion by failing to immediately provide him with kosher meals in light of the fact that plaintiff was not adhering to a strictly kosher diet. *See Marquez*, 322 F.3d at 692-93.

Furthermore, the evidence presented does not show that defendant Tannehill had knowledge of plaintiff's requests for religious accommodations before he left for training on October 21, 2009, and until his return on October 27, 2009. During his absence, the policy in place provided that any urgent requests would be addressed by other means. In accordance with that policy, plaintiff's non-urgent requests submitted on and after October 18, 2009 were set aside to be addressed by Tannehill upon his return. The fact that plaintiff's requests were not identified as "urgent" cannot be attributed to defendant Tannehill. Furthermore, upon his return, defendant Tannehill reviewed the requests submitted during his absence and immediately met with plaintiff to discuss his request for religious accommodations. Defendant Tannehill promptly approved accommodations for plaintiff and even waived the written requirement from plaintiff's religious advisor. Under these facts, defendant Tannehill could reasonably believe that he had responded appropriately to plaintiff's request and that his actions

11

did not violate plaintiff's rights. *Galvin*, 374 F.3d at 756-57.

With respect to his request for religious head-wear and prayer book, it is undisputed that plaintiff was provided with instructions on how to obtain such items in the Inmate Handbook. Plaintiff did not enter MADF with any religious items and defendant was not obligated to provide such items to him. In opposition, plaintiff concedes that MADF is not required to provide these items, but asserts that "without Tannehill accommodating the plaintiff's need to have the materials sent into the facility he caused plaintiff to be unable to properly practice his faith." (Opp. 4.) However, he makes no specific allegations with respect to defendant Tannehill's actions which prevented him from complying with the instructions in the handbook in order to obtain the items he needed. He does not dispute that defendant Tannehill met with him several times to discuss his other religious accommodations after Tannehill approved the kosher meals. Nor does plaintiff dispute that he was able to obtain the items from his family after he complied with the directions provided. Plaintiff had the knowledge and the means to obtain the religious items he needed at anytime, and defendant Tannehill made prompt efforts to provide plaintiff with available religious literature. Based on these facts, defendant Tannehill's belief with respect to what the law required of him was reasonable. *Galvin*, 374 F.3d at 756-57.

In sum, defendant Tannehill has shown that a reasonable officer in his position could not have believed that his conduct was unconstitutional. He has met his burden of proof. Plaintiff has not shown that Tannehill's behavior was unlawful from the perspective of a reasonable prison official in the situation presented above. Therefore, defendant is entitled to judgment as a matter of law based on qualified immunity.

### a. SUPERVISOR LIABILITY

Plaintiff claims that former Sheriff-Coroner Cogbill and current Sheriff Freitas violated his rights by failing to maintain a policy or procedure to accommodate inmate's requests for religious accommodations in the event of a programs officer's lack of availability or response to such requests.

First of all, plaintiff's claim that there was no policy in place in the event of a programs officer's lack of availability is without merit as the undisputed evidence shows that defendant

12

Tannehill made provisions for inmate requests to be addressed by another division of MADF during his absence. *See supra* at 3-4. Furthermore, plaintiff's claim against these supervisory defendants fails because he does not allege that defendants Cogbill and Freitas were ever directly involved with his denial of religious accommodations or that they were ever personally aware of plaintiff's situation. Supervisor defendants are entitled to qualified immunity where the allegations against them are simply "bald" or "conclusory" because such allegations do not "plausibly" establish the supervisors' personal involvement in their subordinates' constitutional wrong. *Ashcroft v. Iqbal*, 556 U.S. 662, 675-84 (2009) (noting no vicarious liability under Section 1983 or *Bivens* actions). So it is insufficient for a plaintiff only to allege that supervisors knew about the constitutional violation and that they generally created policies and procedures that led to the violation, without alleging "a *specific* policy" or "a *specific* event" instigated by them that led to the constitutional violations. *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012) (emphasis in original); *cf. Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (finding no qualified immunity where plaintiff pled specific facts that plausibly suggest supervisors' "knowledge of" and "acquiescence in" unconstitutional conduct of subordinates).

If the defendant is a supervisor who had no direct involvement in or direct management responsibility for the alleged constitutional deprivation, the qualified immunity defense must be examined within the context of policy-level activities. *Jeffers v. Gomez*, 267 F.3d 895, 916 (9th Cir. 2001) (suggesting that director of state prison system could be held liable for inadequate training of prison guards on how to respond to a prison riot only if prison director recklessly, maliciously or deliberately established policies that caused Eighth Amendment violations). Here, plaintiff has failed to provide evidence showing that defendants Cogbill and Freitas were ever personally involved or connected to the alleged violations.

Plaintiff asserts in opposition that defendants are responsible for the policies which were followed by the MADF staff, and that these policies caused the violation of his rights. However, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. at 667. Plaintiff makes no factual allegations against these defendants indicating that they knew

13

1  personally that plaintiff faced a violation of his First Amendment rights or rights under

2  RLUIPA and failed to prevent it. Accordingly, defendants Cogbill and Freitas are entitled to

3  qualified immunity. *Id.* at 675-84.

### 3. *MONELL* LIABILITY

Plaintiff claims that defendant Sonoma County ("County") and its administrators violated his rights based on MADF's religious accommodations policies, and for failing to maintain a policy or procedure to accommodate inmate's requests in the event of a programs officer's lack of availability or response to such requests. Defendants assert that the County is entitled to summary judgment based on plaintiff's inability to demonstrate a *Monell* claim under section 1983.

Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort, *see Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978);[3] however, a city or county may not be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior, *see Board of Cty. Comm'rs. of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). To impose municipal liability under section 1983 for a violation of constitutional rights, a plaintiff must show: (1) that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy is the moving force behind the constitutional violation. *See Plumeau v. School Dist. #40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

In order to survive summary judgment on a claim of liability based on an impermissible municipal policy, practice or custom, plaintiff must point to an express policy, practice or custom, or provide evidence showing an inference that such policy, practice or custom exists. *See Waggy v. Spokane County*, 595 F.3d 707, 713 (9th Cir. 2010). "Only if a plaintiff shows

---

[3] Local governing bodies therefore may be sued directly under section 1983 for monetary, declaratory or injunctive relief for the violation of federal rights. *See Monell*, 436 U.S. at 690. They are absolutely immune from liability for punitive damages under section 1983, however. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

14

that his injury resulted from a 'permanent and well settled' practice may liability attach for injury resulting from a local government custom." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989). But a plaintiff may prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded. *See Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992), *cert. denied*, 510 U.S. 932 (1993).

Plaintiff's first attack on MADF's religious accommodations is that he was not permitted to receive kosher meals while he was awaiting for approval of such meals. However, this claim fails under *Resnick v. Adams*, 348 F.3d 763 (9th Cir. 2003), which held that a prison's policy "requiring [a prisoner] to file a standardized application before" providing him with kosher meals satisfied *Turner's* reasonableness test. *See supra* at 7.

Plaintiff's second claim that the County's policy of having inmates verify his religious beliefs through verification by an organized religious group violates his constitutional rights is contradicted by the record. The undisputed facts show that defendant Tannehill in fact waived this requirement when he approved plaintiff's request. *See supra* at 4. Accordingly, plaintiff cannot show that such a policy was the driving force behind an alleged constitutional violation because the policy was never applied to him.

Lastly, plaintiff fails to show that the delay in obtaining his kosher meals was the result of a "permanent and well settled practice" by the County. Rather, defendants have presented evidence showing that MADF policies in effect at the time of plaintiff's allegations included "Special Diets - Religious" and "Inmate Request forms" policies. These policies provide that to obtain a kosher diet for religious purposes, an inmate must submit an Inmate Request Form to jail staff, and that within 3 days of submission, a staff member would discuss the issues with the inmate and address them as appropriate. As discussed above, even assuming that staff was aware of plaintiff's request for kosher meals within days of arriving at MADF, they had no indication that failure to provide such meals was unduly burdensome on plaintiff's practice of his religion because he was eating his non-kosher meals regularly and purchasing non-kosher items from the commissary. *See supra* at 8-9. Accordingly, it cannot be said that a delay in

15

providing plaintiff with kosher meals was the result of deliberate indifference to plaintiff's rights when staff members had no reason to believe that their conduct was unlawful. Furthermore, during the time defendant Tannehill was away at training, Tannehill made arrangements to have another MADF division review all inmate request forms and address those requests that were deemed urgent or otherwise should not wait until his return. *Ibid.* Plaintiff's request was not deemed urgent, and therefore was not addressed until defendant Tannehill's return. In light of the fact that plaintiff was continuing to eat his non-kosher meals, it cannot be said that staff members improperly classified his request as non-urgent and could wait until defendant Tannehill's return. Lastly, when defendant Tannehill returned to MADF, he promptly looked into plaintiff's request as soon as he became aware of it in accordance with MADF policies. *Ibid*.

Plaintiff has otherwise failed to present evidence showing the existence of an informal policy with evidence of repeated constitutional violations; there are no allegations of similar incidents of such delay to himself since defendant Tannehill responded to his requests, or to any other inmate. Accordingly, defendants are entitled to summary judgment on plaintiff's *Monell* claim.

4.   **RLUIPA CLAIM**

Plaintiff's remaining claim is for money damages under RLUIPA. Although plaintiff's amended complaint did not expressly allege a claim under RLUIPA, the Court found that it could reasonably be construed to state such a claim. (*See* Dkt. No. 26 at 3.) Defendants point out that the Court also previously dismissed plaintiff's injunctive relief claims without leave to amend. (*See* Dkt. No. 23 at 6.) Accordingly, the remaining issue is whether RLUIPA permits a damages claim against defendants as public officials sued in their personal capacities.

Section 3 of RLUIPA provides:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 [which includes state prisons, state psychiatric hospitals, and local jails], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

16

42 U.S.C. 2000cc-1(a). The statute applies "in any case" in which "the substantial burden is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. 2000cc-1(b)(1).

The availability of money damages from state officials sued in their official capacity turns on whether the State has waived its Eleventh Amendment immunity from such suits or congress has abrogated that immunity under its power to enforce the Fourteenth Amendment. *Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1112 (9th Cir. 2010). Although a state may choose to waive its Eleventh Amendment sovereign immunity, its consent to suit "must be 'unequivocally expressed' in the text of the relevant statute" and may not be implied. *Sossamon v. Texas*, 131 S. Ct. 1651, 1658 (2011) (quoting *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 99 (1984)). RLUIPA's provision that a person asserting a violation may obtain "appropriate relief," 42 U.S.C. 2000cc-2a, does not unambiguously impose a waiver of sovereign immunity from claims for damages as a condition of receipt of federal funds, so a state's receipt of such funds is not a waiver. *Sossamon*, 131 S. Ct. at 1660, 1663 (holding that "States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver").

Defendants assert that while the Ninth Circuit has yet to rule on this issue, it has noted that "[t]he Fifth, Seventh, and Eleventh Circuits have held that RLUIPA does not provide an action for damages for individual capacity claims." *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 921, fn. 3 (9th Cir. 2011). The Third Circuit has also recently held that RLUIPA does not permit actions against government employees in their individual capacities. *See Sharp v. Johnson*, 669 F.3d 144, 153 (3rd Cir. 2012). These holdings are persuasive. Plaintiff's RLUIPA claim for damages against defendants in their personal capacities do not state valid claims upon which relief may be granted. RLUIPA states that "[n]o *government* shall impose a substantial burden . . ."; it is not directed at individuals. 42 U.S.C. 2000cc-1(a) (emphasis added). While Congress may condition the receipt of federal funds upon a state's

17

compliance with particular mandates, no individuals have received any such funds here. Accordingly, defendants are entitled to summary judgment on plaintiff's claim for damages under RLUIPA.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (docket number 39) is **GRANTED**.

The clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: October  9 , 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

G:\PRO-SE\WHA\CR.10\ELFAND5692.MSJ.hhl.wpd